STEWART OCCHIPINTI, LLP
Charles A. Stewart, III (CS-7099)
65 West 36th Street, 7th Floor
New York, New York 10018
Telephone: (212) 239-5500
Facsimile: (212) 239-7030
cstewart@somlaw.com

*Attorney for Defendant Mark Abeshouse*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------X

| | |
|---|---|
| ANDREW C. SANKIN, | ) |
| | ) |
| Plaintiff, | )     7:07-cv-10491-CLB |
| | ) |
| | ) |
| -against- | ) |
| | ) |
| MARK ABESHOUSE and RHONDA | ) |
| LEONARD, | ) |
| | ) |
| Defendants. | ) |
| | ) |

-----------------------------------------------------X

## NOTICE OF MOTION FOR DISMISSAL

PLEASE TAKE NOTICE that, upon the accompanying Declaration of Charles A.

Stewart, III, and the exhibits thereto, the accompanying Memorandum of Law in Support

Abeshouse's Motion to Dismiss Plaintiff's Complaint, and all prior pleadings and

proceedings herein, defendant Mark Abeshouse will move in the United States District

Court for the Southern District of New York, before the Honorable Charles L. Brieant,

U.S.D.J., at the United States Courthouse, 300 Quarropas Street, White Plains, New York

10601, on March 7, 2008, at 10:00 a.m., or on such other date and time set by the Court,

for an Order, pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, to

dismiss all claims against him, with prejudice, and for such other and further relief as the Court deems just and proper.

PLEASE TAKE FURTHER NOTICE that answering papers, if any, shall be served in accordance with the schedule established by the Court, or the Local Civil Rules.

Dated: New York, New York
January 11, 2008

Respectfully submitted,

**STEWART OCCHIPINTI, LLP**

By:_____/s/_____
Charles A. Stewart, III (CS-7099)
65 West 36th Street, 7th Floor
New York, New York 10018
(212) 239-5500

*Attorneys for Defendant Mark Abeshouse*

TO:    Richard W. Signorelli, Esq.
Law Office of Richard E. Signorelli
799 Broadway, Suite 539
New York, New York 10003

Terence William McCormick, Esq.
Mintz & Gold LLP
470 Park Avenue South, 10th Floor North
New York, New York  10016

STEWART OCCHIPINTI, LLP
Charles A. Stewart, III (CS-7099)
65 West 36th Street, 7th Floor
New York, New York 10018
Telephone: (212) 239-5500
Facsimile: (212) 239-7030
cstewart@somlaw.com

*Attorney for Defendant Mark Abeshouse*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------X
ANDREW C. SANKIN,                                )
                                                 )
                          Plaintiff,             )        7:07-cv-10491-CLB
                                                 )
                                                 )
        -against-                                )
                                                 )
MARK ABESHOUSE and RHONDA                        )
LEONARD,                                         )
                                                 )
                          Defendants.            )
                                                 )
-------------------------------------------------------X

## DECLARATION OF CHARLES A. STEWART, III IN SUPPORT OF DEFENDANT MARK ABESHOUSE'S MOTION TO DISMISS COMPLAINT

Charles A. Stewart, III, hereby declares, pursuant to 28 U.S.C. § 1746, as follows:

1.    I am a member of Stewart Occhipinti, LLP, attorneys for Mark Abeshouse, one

of the defendants in the above captioned action.  I respectfully submit this declaration in support

of Mr. Abeshouse's motion, pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, to

dismiss all claims against him, with prejudice, and for such other and further relief as the Court

deems just and proper.

2.    Attached hereto as Exhibit A is a true and accurate copy of the award in the

National Association of Securities Dealers ("NASD") arbitration proceeding between Augustus

Capital LLC ("Augustus") and Andrew Sankin (the "NASD Proceeding"). The NASD

Proceeding forms the basis for Sankin's instant malicious prosecution action against Abeshouse

and Rhonda Leonard ("Leonard"), Abeshouse's wife.

  3.  Attached hereto as Exhibit B is a true and accurate copy of Mr. Sankin's post-

hearing brief in the NASD Proceeding.

  4.  Attached hereto as Exhibit C is a true and accurate copy of Augustus' post-

hearing brief in the NASD Proceeding.

  5.  Attached hereto as Exhibit D is a true and accurate copy of the September 18,

2007 Decision of the Supreme Court of the State of New York, County of New York, confirming

the arbitration award in the NASD Proceeding, which was docketed and filed in the Office of the

Clerk on October 1, 2007.

  6.  Attached hereto as Exhibit E is a true and accurate copy of the Complaint filed

by Sankin in the Supreme Court of the State of New York, County of Westchester, against

Abeshouse and Leonard. The Complaint subsequently was removed by the defendants to this

court on November 20, 2007.

Dated: New York, New York
   January 11, 2008

             _____
               Charles A. Stewart, III

**EXHIBIT A**

# Award
## NASD Dispute Resolution

In the Matter of the Arbitration Between:

Augustus Capital LLC (Claimant) vs. Andrew C. Sankin (Respondent)

Case Number: 05-02528          Hearing Site: New York, New York

Nature of the Dispute: Member vs. Associated Person.

## REPRESENTATION OF PARTIES

Claimant Augustus Capital LLC hereinafter referred to as "Claimant": Charles A. Stewart, Esq., Stewart Occhipinti, LLP, New York, NY and Ronda S. Leonard, Esq., New Rochelle, NY.

Respondent Andrew C. Sankin hereinafter referred to as "Respondent": Ira Lee Sorkin, Esq., Dickstein Shapiro Morin & Oshinsky LLP, New York, NY. Previously represented by Donald A. Corbett, Esq., Carter Ledyard & Milburn, LLP, New York, NY.

## CASE INFORMATION

Statement of Claim filed on or about: May 13, 2005.
Reply to Counterclaim filed on or about: September 16, 2005.
Claimant signed the Uniform Submission Agreement: May 12, 2005.

Statement of Answer and Counterclaim filed by Respondent on or about: September 6, 2005.
Corrected Statement of Answer and Counterclaim filed by Respondent on or about: September 22, 2005.
Respondent signed the Uniform Submission Agreement: September 13, 2005.

## CASE SUMMARY

Claimant asserted the following causes of action: breach of contract – marketing fees, breach of contract – broker-dealer fees, breach of contract – placement fees, declaratory judgment – marketing fees, declaratory judgment – placement fees, unjust enrichment, quantum meruit, conversion, and accounting.

Unless specifically admitted in his Answer, Respondent denied the allegations made in the Statement of Claim and asserted various affirmative defenses.

In his Counterclaim, Respondent asserted the following cause of action: defamation.

NASD Dispute Resolution
Arbitration No. 05-02528
Award Page 2 of 5

Unless specifically admitted in its Reply to Counterclaim, Claimant denied the allegations made in the Counterclaim.

## RELIEF REQUESTED

Claimant requested compensatory damages in the amount of $3,351,000.00, pre- and post-judgment interest, costs, including attorneys' fees and such other relief as the arbitration panel deems proper.

Respondent requested the dismissal of the Statement of Claim in its entirety.

In his Counterclaim, Respondent requested unspecified damages, expungement, attorneys' fees and costs.

Claimant requested the dismissal of the Counterclaim in its entirety.

## OTHER ISSUES CONSIDERED AND DECIDED

On July 12, 2007, NASD Dispute Resolution notified the parties that pursuant to Rule 10202 of the Code of Arbitration Procedure, a panel consisting of two public arbitrators and one non-public arbitrator should have been appointed to this matter based upon Respondent's Counterclaim. The parties were given until July 19, 2007 to object to the panel composition. By letter dated July 16, 2007, Respondent accepted the Panel's composition. Claimant did not submit an objection.

The parties have agreed that the Award in this matter may be executed in counterpart copies or that a handwritten, signed Award may be entered.

## AWARD

After considering the pleadings, the testimony and evidence presented at the hearing, and the post-hearing submissions, the Panel has decided in full and final resolution of the issues submitted for determination as follows:

1. Claimant's claims are denied in their entirety.

2. The Panel recommends the expungement of Respondent Andrew Sankin's U5 filed by Claimant Augustus Capital on August 6, 2004. The Panel recommends that the Reason for Termination section should be expunged and that the Reason for Termination be changed to voluntary. The Panel's recommendation is based upon the defamatory nature of the information.

3. Any and all relief not specifically addressed herein is denied.

## FEES

Pursuant to the Code, the following fees are assessed:

NASD Dispute Resolution
Arbitration No. 05-02528
<u>Award Page 3 of 5</u>

## Filing Fees

NASD Dispute Resolution will retain or collect the non-refundable filing fees for each claim:

| | |
|---|---|
| Initial claim filing fee | = $2,000.00 |
| Counterclaim filing fee | = $  250.00 |

## Member Fees

Member fees are assessed to each member firm that is a party in these proceedings or to the member firms that employed the associated persons at the time of the events giving rise to the dispute.  Accordingly, Augustus Capital LLC is a party.

| | |
|---|---|
| Member surcharge | = $2,800.00 |
| Pre-hearing process fee | = $  750.00 |
| Hearing process fee | = $5,000.00 |

## Adjournment Fees

Adjournments granted during these proceedings for which fees were assessed:

| | |
|---|---|
| November 13-16, 2006 adjournment by Respondent | = $ 1,200.00 |
| December 20-22, 2006 adjournment by Claimant | = $ 1,200.00 |

## Forum Fees and Assessments

The Panel has assessed forum fees for each session conducted or each decision rendered on a discovery-related motion on the papers or a contested motion for the issuance of a subpoena. A session is any meeting between the parties and the arbitrators, including a pre-hearing conference with the arbitrators, that lasts four (4) hours or less.  Fees associated with these proceedings are:

One (1) Decision on discovery-related motion on the papers
with (3) three arbitrators @ $600.00                                        = $   600.00
Respondent submitted one discovery-related motion

Three (3) Pre-hearing sessions with a single arbitrator @ $450.00          = $ 1,350.00

| Pre-hearing conferences: | March 24, 2006 | 1 session |
|---|---|---|
| | November 30, 2006 | 1 session |
| | January 24, 2007 | 1 session |

Two (2) Pre-hearing sessions with Panel @ $1,200.00                         = $ 2,400.00

| Pre-hearing conferences: | November 7, 2005 | 1 session |
|---|---|---|
| | May 9, 2006 | 1 session |

Thirteen (13) Hearing sessions @ $1,200.00 per session                      = $15,600.00

| Hearing Dates: | April 9, 2007 | 2 sessions |
|---|---|---|
| | April 10, 2007 | 2 sessions |
| | April 11, 2007 | 2 sessions |
| | June 12, 2007 | 2 sessions |
| | June 13, 2007 | 2 sessions |
| | June 14, 2007 | 3 sessions |

| | |
|---|---|
| Total Forum Fees | = $19,950.00 |

NASD Dispute Resolution
Arbitration No. 05-02528
Award Page 4 of 5

1. The Panel has assessed $9,975.00 of the forum fees to Claimant.
2. The Panel has assessed $9,975.00 of the forum fees to Respondent.

### Fee Summary

1. Claimant is solely liable for:

| | |
|---|---|
| Initial Filing Fee | = $ 2,000.00 |
| Member Fees | = $ 8,550.00 |
| Adjournment Fee | = $ 1,200.00 |
| Forum Fees | = $ 9,975.00 |
| Total Fees | = $21,725.00 |
| Less payments | = $11,750.00 |
| Balance Due NASD Dispute Resolution | = $ 9,975.00 |

2. Respondent is solely liable for:

| | |
|---|---|
| Counterclaim Filing Fee | = $ 250.00 |
| Adjournment Fee | = $ 1,200.00 |
| Forum Fees | = $ 9,975.00 |
| Total Fees | = $11,425.00 |
| Less payments | = $ 1,800.00 |
| Balance Due NASD Dispute Resolution | = $ 9,625.00 |

All balances are payable to NASD Dispute Resolution and are due upon receipt pursuant to Rule 10330(g) of the Code.

NASD Dispute Resolution
Arbitration No. 05-02528
Award Page 5 of 5

## ARBITRATION PANEL

| | | |
|---|---|---|
| Philip M. Mandel, Esq. | - | Non-Public Arbitrator, Presiding Chairperson |
| Gilbert F. Bach, Sr., Esq. | - | Non-Public Arbitrator |
| Lionel C. Bandler | - | Non-Public Arbitrator |

I, the undersigned Arbitrator, do hereby affirm, pursuant to Article 7507 of the Civil Practice Law and Rules, that I am the individual described herein and who executed this instrument, which is my award.

**Concurring Arbitrators' Signatures**


*Philip M. Mandel*                                    7/26/07
Philip M. Mandel, Esq.                              Signature Date
Non-Public Arbitrator, Presiding Chairperson




Gilbert F. Bach, Sr., Esq.                         Signature Date
Non-Public Arbitrator




Lionel C. Bandler                                  Signature Date
Non-Public Arbitrator


July 26, 2007

Date of Service  (For NASD Dispute Resolution use only)

NASD Dispute Resolution
Arbitration No. 05-02528
Award Page 5 of 6

## ARBITRATION PANEL

| | | |
|---|---|---|
| Philip M. Mandel, Esq. | – | Non-Public Arbitrator, Presiding Chairperson |
| Gilbert F. Bach, Sr., Esq. | – | Non-Public Arbitrator |
| Lionel C. Bandler | – | Non-Public Arbitrator |

I, the undersigned Arbitrator, do hereby affirm, pursuant to Article 7507 of the Civil Practice Law and Rules, that I am the individual described herein and who executed this instrument, which is my award.

## Concurring Arbitrators' Signatures

_____                          _____
Philip M. Mandel, Esq.                                          Signature Date
Non-Public Arbitrator, Presiding Chairperson


_____                          7-25-07
Gilbert F. Bach, Sr., Esq.                                       Signature Date
Non-Public Arbitrator


_____                          _____
Lionel C. Bandler                                                  Signature Date
Non-Public Arbitrator


July 26, 2007
_____
Date of Service (For NASD Dispute Resolution use only)

NASD Dispute Resolution
Arbitration No. 05-02528
Award Page 5 of 5

## ARBITRATION PANEL

Philip M. Mandel, Esq.          -          Non-Public Arbitrator, Presiding Chairperson
Gilbert F. Bach, Sr., Esq.      -          Non-Public Arbitrator
Lionel C. Bandler               -          Non-Public Arbitrator

I, the undersigned Arbitrator, do hereby affirm, pursuant to Article 7507 of the Civil
Practice Law and Rules, that I am the individual described herein and who executed this
instrument, which is my award.

**Concurring Arbitrators' Signatures**


_____          _____
Philip M. Mandel, Esq.                             Signature Date
Non-Public Arbitrator, Presiding Chairperson


_____          _____
Gilbert F. Bach, Sr., Esq.                          Signature Date
Non-Public Arbitrator


_____          _____
Lionel C. Bandler                                   Signature Date
Non-Public Arbitrator


July 26, 2007
_____
Date of Service  (For NASD Dispute Resolution use only)

**EXHIBIT B**

NATIONAL ASSOCIATION OF SECURITIES DEALERS
ARBITRATION PROCEEDING – NEW YORK CITY

|  |  |  |
|---|---|---|
| AUGUSTUS CAPITAL LLC, | ) ) ) | NASD Arbitration No. 05-02528 |
| Claimant, | ) ) |  |
| v. | ) ) |  |
| ANDREW C. SANKIN, | ) ) ) |  |
| Respondent. | ) ) ) |  |

## POST-HEARING MEMORANDUM

Ira Lee Sorkin, Esq.
Adam Weiss, Esq.
Justin Lamson (Summer Intern)
DICKSTEIN SHAPIRO LLP
1177 Avenue of the Americas
New York, NY   10036
(212) 277-6500

*Counsel for Respondent Andrew C. Sankin*

# TABLE OF CONTENTS

I.  PRELIMINARY STATEMENT ................................................................. 1

II.  THE STATUTE OF FRAUDS ............................................................... 2

III.  UNINDICTED CO-CONSPIRATOR ..................................................... 5

IV.  ATTORNEYS' FEES ........................................................................ 9

V.  CONCLUSION.................................................................................. 11

DOCSNY-254805v03

# TABLE OF AUTHORITIES

## FEDERAL CASES

*Bronner v. Park Place Entertainment Corp.*, 137 F. Supp. 2d 306 (S.D.N.Y. 2001) .......................3

*McDaniel v. Bear & Stearns Co.*, 196 F. Supp. 2d 343 (S.D.N.Y. 2002) ................................. 9-10

*United States v. Adkins*, 842 F.2d 210 (8th Cir. 1988) ........................................................8

*United States v. Briggs*, 514 F.2d 794 (5th Cir. 1975)........................................................9

*United States v. Ladd*, 218 F.3d 701 (7th Cir. 2000) .........................................................8

*United States v. Saneaux*, 365 F. Supp. 2d 493 (S.D.N.Y. 2005).........................................8

*United States v. Washington*, 952 F.2d 1402 (D.C. Cir. 1991)...........................................8

## STATE CASES

*CBA Industrial, Inc. v. Circulation Management, Inc.*, 179 A.D. 615, 578 N.Y.S.2d 234
  (2d Dep't 1992)........................................................................................9

*Charles Hyman, Inc. v. Olsen Industrial, Inc.*, 163 A.D.2d 232 (N.Y. App. Div. 1990) ...............3

*Clarendon Marketing, Inc. v. CT Chemicals USA, Inc.*, 1993 WL 300041, 93 Civ. 0285
  (PLK) (S.D.N.Y. Aug. 4, 1993) ...............................................................10, 11

*International Fidelity Insurance Co. v. Robb*, 159 A.D.2d 687 (N.Y. App. Div. 1990) .................4

*McSorley v. Philip Morris, Inc.*, 170 A.D.2d 440, (N.Y. App. Div. 1991) ........................... 3-4

*Rogoff v. San Juan Racing Association*, 77 A.D.2d 831 (N.Y. App. Div. 1980) ...........................4

## STATUTES

N.Y. Gen. Oblig. Law § 5-701 et seq. .........................................................................1, 3

N.Y. CPLR § 3018........................................................................................................3, 4

N.Y. CPLR § 3211........................................................................................................3

N.Y. CPLR § 7513....................................................................................................9, 10

DOCSNY-254805v03

## OTHER AUTHORITIES

Dan Freedman, "Clinton Adviser to be Named Unindicted Co-Conspirator," The Times
Union (Albany, NY) June 20, 1996 ................................................................................. 7

Elkan Abramowitz and Barry A. Bohrer, "Unindicted Co-Conspirators, Due Process, and
Government Tactics", New York Law Journal, March 7, 2006 ................................... 8

Hon. Leonard Sand *et al.*, 1 <u>Modern Federal Jury Instructions (Criminal)</u> ¶¶ 3A-1, 3A-3,
3A-4 2007 .......................................................................................................... 6-7

Ira P. Robbins, "Guilty Without Charge: Assessing the Due Process Rights of Unindicted
Co-Conspirators", 2004 Federal Courts Law Review ............................................ 8, 9

NASD Code of Arbitration Procedure § 10205(c) ..................................................... 10

New York Rules of Court § 130-1.1(a)-(c) ................................................................. 11

DOCSNY-254805v03

**I.**    **PRELIMINARY STATEMENT**

This Post-Hearing memorandum is respectfully submitted, pursuant to the direction of the Hearing Panel in the above-mentioned captioned case, to address three issues:

1. Did the failure of respondent Andrew Sankin ("Mr. Sankin") to plead the Statute of Frauds (N.Y. Gen. Oblig. Law § 5-701) as an affirmative defense in his Answer to the Statement of Claim of Claimant Augustus Capital LLC ("Augustus") preclude Mr. Sankin from contending that the Statute of Frauds is an absolute defense to the existence of an alleged agreement?

2. What is the meaning of "unindicted co-conspirator" and what weight, if any, should the Hearing Panel give to this characterization of Mr. Sankin's conduct?

3. Is the Hearing Panel authorized to award legal fees and expenses to the prevailing party?

At the direction of the Hearing Panel, this Memorandum is limited to twelve pages – five pages on each of the first two issues and two pages on the last issue.

1

## II.     THE STATUTE OF FRAUDS

It is clear that there was an oral agreement between Mr. Sankin and Augustus, and the Hearing Panel must decide the *terms* of that agreement. Accordingly, while the Statute of Frauds was not pleaded as an Affirmative Defense, the issue of whether there was a waiver of the defense of a Statute of Frauds as an absolute defense to any agreement is a secondary issue.

There is no disagreement that Mr. Sankin and Augustus entered into an agreement in or about February, 1999 whereby Mr. Sankin would "park" his broker-dealer license with Augustus, and Mr. Sankin, in turn, agreed to compensate Augustus a fixed amount of the commissions he received from Perceptive Life Sciences LLP ("Perceptive") through First New York Securities that were attributable to investors whose names were supplied to Mr. Sankin by Augustus. In addition to this "marketing fee," as Claimant has labeled it, Augustus alleges that the compensation due it under this agreement had two other distinct components. Augustus claims that the agreement also governed payments of so-called "broker-dealer fees," and a so-called "placement fee." The so-called broker-dealer fees allegedly compensated Augustus for overhead expenses he incurred such as registration, insurance, compliance regulation, and administrative staff expenses. Augustus also claims entitlement to a so-called "placement fee" for introducing Mr. Sankin to Perceptive. "Marketing fees" represent compensation for access to Augustus's alleged database[1] of potential investors who became investors in Perceptive, and for which Augustus was paid approximately $350,000 before Mr. Sankin voluntarily resigned

---

[1] As established at the hearing, Augustus's so-called "proprietary" database was not developed entirely through Augustus's efforts.

DOCSNY-254805v03

from Augustus. Augustus's role was strictly limited to providing names to Mr. Sankin without any agreement of confidentiality or proprietary interest.

It is clear that Augustus's alleged oral agreement for so-called placement and marketing fees is barred by the New York Statute of Frauds ("Statute of Frauds"), which requires that all such agreements be in writing. Although not every type of contract is subject to the Statute of Frauds, contracts to pay compensation for services rendered in negotiating a business opportunity, including by finders who procure introductions to other parties, fall under the auspices of the Statute of Frauds. *See* N.Y. Gen. Oblig. Law § 5-701(a)(10); *see also Charles Hyman, Inc. v. Olsen Indus., Inc.*, 163 A.D.2d 232, 234-35 (N.Y. App. Div. 1990). The statute defines "negotiating" as including "procuring an introduction to a party to the transaction or assisting in the negotiation or consummation of the transaction." N.Y. Gen. Oblig. Law § 5-701(a)(10). *See Bronner v. Park Place Entm't Corp.*, 137 F. Supp. 2d 306, 309 (S.D.N.Y. 2001) ("[A] contract to pay compensation for services rendered in procuring the introduction of a party to a business transaction, or in assisting in negotiating or consummating a business transaction, is void unless it is in a writing signed by the party to be charged.").[2]

Generally, the failure to plead the Statute of Frauds as an affirmative defense in a responsive pleading or a motion to dismiss constitutes a waiver. *See* CPLR 3018(b) and CPLR 3211(e). The purpose for pleading the Statute of Frauds is to prevent the plaintiff from being surprised during the trial and precludes the defense from raising new issues of fact. Where, however, plaintiff has a full and fair opportunity to argue the merits of the Statute of Frauds defense, defendant's failure to raise the defense does not constitute a waiver. *See McSorley v.*

---

[2] *See* Section III.E. of Sankin's Pre-Hearing Memorandum for a complete discussion of the merits of Sankin's Statute of Frauds defense.

DOCSNY-254805v03

*Philip Morris, Inc.*, 170 A.D.2d 440 (N.Y. App. Div. 1991) (finding failure to assert federal

preemption defense in answer not a waiver where plaintiffs had opportunity to argue merits of

the defense).  As the Court stated in *International Fidelity Ins. Co. v. Robb*, 159 A.D.2d 687

(N.Y. App. Div. 1990):

> Plaintiff maintains that defendants cannot prevail on the Statute of Frauds defense
> because it was not raised in their answer, citing <u>CPLR 3018(b)</u>.  That subsection
> requires a party in its responsive pleadings to "plead all matters which if not
> pleaded would be likely to take the adverse party by surprise or would raise issues
> of fact not appearing on the face of the prior pleading."  Here, there was no
> surprise.  There was, in fact, ample opportunity to address the Statute of Frauds
> issue in plaintiff's examination before trial.  There, the issue of a written contract
> was indeed explored and, in addition, numerous documents were submitted with
> the purpose of meeting the Statute of Frauds requirements.  Allowing this defense
> in such circumstances comports with the practice advocated in the commentary
> accompanying this statute. *See* Siegel, Practice Commentaries, McKinney's Cons.
> Laws of N.Y., Book 7B, CPLR 3212:11.

*Id.* at 688-89

In *International Fidelity*, defendant first raised the Statute of Frauds defense in

connection with a motion for summary judgment, <u>after</u> the pleadings had been filed.  The court

found that defendant's omission of the Statute of Frauds defense from the answer did not

necessarily result in a waiver of the defense.  The plaintiff was on notice of the issue and had "a

full and fair opportunity to argue the merits of the Statute of Frauds defense." *Id.* at 689.  *See*

*also Rogoff v. San Juan Racing Assn.*, 77 A.D.2d 831 (N.Y. App. Div. 1980) (New York

Appellate Division holding there was no waiver under CPLR 3018(b) of the Statute of Frauds

defense where plaintiff had ample opportunity to address the issue).

Here, Augustus was fully apprised and aware *prior* to the hearing that the Statute of

Frauds was part of Mr. Sankin's defense.  Indeed, Augustus made no claim that it was

"surprised" by this defense.[3]  Mr. Sankin first placed Augustus on notice of the Statute of Frauds

defense in his March 26, 2007 Pre-Hearing Memorandum.  Mr. Sankin did not raise new issues

of fact in this submission or at the hearing, and Augustus was in no way prejudiced by Mr.

Sankin's invocation of the defense at the Hearing.  In fact, Augustus concedes there is not one

scintilla of documentary evidence of the alleged oral agreement for any fees.  The Hearing Panel

afforded Augustus a full and fair opportunity to address the Statute of Frauds defense.

Moreover, Augustus was aware of the Statute of Frauds issue not only from Mr. Sankin's Pre-

Hearing Memorandum, but also from the "slopped together" and "off the cuff" infamous and

threatening opinion letter of Rhonda Leonard, the self-described General Counsel to Augustus,

where she stated that in any new agreement between Augustus and its brokers, "it is incumbent

that [Augustus] as per the Statute of Frauds create a formal written agreement between

[Augustus] and each of its RRs detailing compensation arrangement." (Exhibit R88).  Further,

the lack of any reference to a written agreement is also evidenced by Mark Abeshouse

("Abeshouse") admitting that Augustus's so-called "broker-dealer fees" were accrued and

deferred "in his head."

     Accordingly, the Statute of Frauds defense survives and was not waived despite the

omission of the affirmative defense from the responsive pleadings filed by Mr. Sankin.

Augustus was clearly on notice and not surprised by this defense.

III.      **UNINDICTED CO-CONSPIRATOR**

     There is no disagreement that Mr. Sankin was named as an unindicted co-conspirator

some fifteen years ago.  While this fact is not relevant in any way to the issues in this case, and

---

[3] Indeed, in his opening statement counsel for Augustus raised the Statute of Frauds issue.
Accordingly, Augustus was fully aware of the issue before the hearing.

DOCSNY-254805v03

was introduced solely to smear Mr. Sankin again as he was and still is being smeared on his U-5, we nevertheless address the issue of "unindicted co-conspirator" as directed by the Hearing Panel.

On April 28, 1992, Deborah Gore Dean ("Dean") was indicted on charges of soliciting and accepting an illegal gratuity and making a false statement in connection with mismanagement of a Department of Housing and Urban Development ("HUD") program aimed at upgrading substandard housing for low-income tenants. Two months later, a superseding indictment, which listed several unnamed co-conspirators, charged Dean with thirteen counts, including fraud, perjury, and conspiracy. Dean was later convicted on twelve counts, including three counts of conspiracy, one count of accepting an illegal gratuity, four counts of perjury, and four counts of engaging in a scheme to conceal material facts. On appeal, several of Dean's convictions were reversed. Although Mr. Sankin was referred to during Dean's trial and in the appellate court decision as an unindicted co-conspirator, he was not named in the indictment and therefore was not charged with any crime.

When someone is not indicted, it reflects the view that the individual did not intend to violate the law and did not knowingly and willingly participate in a crime. To act with intent does not mean merely to act with the intent to do the acts which were done. Instead, acting with intent involves awareness that one's actions are wrong or in contravention of the law. To act knowingly means to act voluntarily and deliberately, rather than mistakenly or inadvertently. To act willfully means to act knowingly and purposely, with an intent to do something the law forbids.

6

According to the definitive work co-authored by the Honorable Leonard B. Sand, United States District Judge for the Southern District of New York, on what it means to act knowingly, willfully, and intentionally, those terms are defined as:

(1) Knowingly: "A person acts knowingly if he acts intentionally and voluntarily, and not because of ignorance, mistake, accident, or carelessness";

(2) Willfully: "Willfully means to act with knowledge that one's conduct is unlawful and with the intent to do something the law forbids, that is to say with the bad purpose to disobey the law"; and,

(3) Intentionally: "Acts must be deliberate and purposeful and a product of a conscious objective."

See Hon. Leonard Sand et al., 1 Modern Federal Jury Instructions (Criminal) ¶¶ 3A-1, 3A-3, 3A-4 (2007).

The failure to indict an individual reflects the fact that the individual acted without meeting either one or all of the required states of mind.  There is no evidence, either in the opinion of the United States Court of Appeals, entered into evidence as Exhibit C38, or in the hearing record, to support a claim that Mr. Sankin acted intentionally and voluntarily with respect to the Dean conspiracy.  Moreover, there is no evidence that Mr. Sankin was aware his conduct was unlawful; and finally, there is no evidence that Mr. Sankin's actions in connection with the conspiracy were deliberate and purposeful.[4]  For that reason, Mr. Sankin's status as an unindicted co-conspirator in the Dean case reflects that he did not act in contravention of the law.

The main reason prosecutors name individuals as unindicted co-conspirators is for evidentiary purposes.  See, e.g., Dan Freedman, "Clinton Adviser to be Named Unindicted Co-Conspirator," The Times Union (Albany, NY) June 20, 1996, at A3.  ("In practical terms, the

---

[4] If it were otherwise, it would still have no relevance or bearing on the issues in this case.

DOCSNY-254805v03

device enables prosecutors to bypass the court rule against hearsay testimony."). In general, hearsay evidence is inadmissible at trial. However, under Rule 801(d)(2)(E) of the Federal Rules of Evidence, hearsay evidence of co-conspirators' statements and acts performed during and in furtherance of the conspiracy are admissible. *See, e.g., United States v. Adkins*, 842 F.2d 210, 213 (8th Cir. 1988) (holding that Fed. R. Evid. 801(d)(2)(E) "takes the statements of coconspirators outside the hearsay rule" and that the rule is equally applicable to indicted and unindicted co-conspirators); *United States v. Washington*, 952 F.2d 1402, 1407 (D.C. Cir. 1991) ("In this Circuit the statements of 'joint venturers' may be admitted under Rule 801(d)(2)(E) . . . if the trial judge finds that there is substantial evidence independent of the statements that a conspiracy existed, that the defendant and the out-of-court declarant were members of the conspiracy, and that the statements were made in furtherance of it."); *United States v. Saneaux*, 365 F. Supp. 2d 493, 498 (S.D.N.Y. 2005) (denying defendant's motion to enjoin the government from recordings of an unindicted co-conspirator into evidence). As such, in order to admit evidence that would normally be inadmissible, prosecutors frequently name individuals as co-conspirators. *See United States v. Ladd*, 218 F.3d 701, 706 (7th Cir. 2000) (noting concern of the district court that individuals named as unindicted co-conspirators were named as such to justify the admission of their hearsay statements).

Conspiracy is one of the most frequently charged crimes, Robbins, "Guilty Without Charge: Assessing the Due Process Rights of Unindicted Co-Conspirators", 2004 Federal Courts Law Review ("Fed. Cts. L. Rev.") and unindicted co-conspirators are named in "virtually every conspiracy case," Elkan Abramowitz and Barry A. Bohrer, "Unindicted Co-Conspirators, Due Process, and Government Tactics," *New York Law Journal*, March 7, 2006. However, despite the frequency with which unindicted co-conspirators are named in a case, they are often afforded

fewer rights to defend themselves than indicted co-conspirators are provided. Indeed, while indicted co-conspirators enjoy constitutional protections and are presumed innocent until proven guilty, unindicted co-conspirators have little to no due process rights to clear their name. An unindicted co-conspirator does not become a party to the case and thus has no right to intervene in the case in order to clear his name. Robbins, 2004 Fed. Cts. L. Rev. *See also United States v. Briggs,* where the Court stated:

> [T]he incidents of due process afforded an unindicted conspirator are more limited than those available to one named as a defendant. The unindicted conspirator is not a party to the criminal trial where names and facts come to light, and he has no right under the Federal Rules of Criminal Procedure to intervene.

514 F.2d 794, 804 (5th Cir. 1975).

As for the grant of immunity given to Mr. Sankin, and, as he testified, to others as well, a careful and prudent lawyer would always request immunity in any criminal investigation. It will also be recalled that Mr. Sankin testified that <u>at no time</u> before or after the grant of immunity was he named as a "target" or "subject" of the investigation.

## IV.    ATTORNEYS' FEES

Section 7513 of the New York Civil Practice Law and Rules ("CPLR") provides that "[u]nless otherwise provided in the agreement to arbitrate, the arbitrators' expenses and fees, together with other expenses, not including attorney's fees, incurred in the conduct of the arbitration, shall be paid as provided in the award." C.P.L.R. § 7513 (emphasis added). *See also CBA Indus., Inc. v. Circulation Management, Inc.*, 179 A.D. 615, 616, 578 N.Y.S.2d 234, 235 (2d Dep't 1992) (holding that attorneys' fees are excluded unless they are provided for in the arbitration agreement).

DOCSNY-254805v03

New York courts have held that, consistent with C.P.L.R. 7513, arbitrators may award attorneys' fees if either the parties' *agreement* to arbitrate provides for the award, or *the parties acquiesce to the payment of attorneys' fees*. As the Court stated in *McDaniel v. Bear & Stearns Co.*, 196 F. Supp. 2d 343 (S.D.N.Y. 2002):

> Courts have held that, consistent with section 7513, arbitrators *may* award attorneys' fees if either (1) the parties' agreement to arbitrate so provides, *see Spector v. Torenberg*, 852 F. Supp. 201, 210 (S.D.N.Y. 1994) (citing N.Y. C.P.L.R. §7513), or (2) the parties acquiesce to the payment of attorneys' fees, *see id.*; *GPR, Inc. v. Phoenix Petroleum Co.*, No. 95 Civ. 0395, 1995 WL 314709, at *1 (S.D.N.Y. May 24, 1995).

The Panel may award attorneys' fees under either of these prongs.

Mr. Sankin and Augustus submitted to arbitration under the rules of the NASD. Section 10205 (c) of the NASD Code of Arbitration Procedure ("NASD Code") for cases filed before April 16, 2007 states that the arbitrators may determine in the award the amount of "other costs and expenses of the parties and arbitrator(s) which are within the scope of the agreement of the parties." In *Clarendon Marketing, Inc. v. CT Chemicals USA, Inc.*, No. 93 Civ. 0285 (PLK), 1993 WL 300041 (S.D.N.Y. 1993) the parties agreed to arbitration under the Maritime Arbitration Rules of the Society of Maritime Arbitrators. These rules allowed for the arbitrators to assess expenses of the arbitration against a specific party. Applying New York law, the court upheld the arbitrators interpretation of the term "expenses" to include attorneys' fees. *See Clarendon Marketing*, 1993 WL 300041 at *5. Therefore, section 10205 of the NASD Code is incorporated into the agreement between Sankin and Augustus and can be read to allow for the arbitrators to award attorneys' fees

A party can acquiesce to the award of attorneys' fees by either making its own demand for attorneys' fees or by failing to object to the other party's demand for such fees. *See*

*McDaniel* 196 F. Supp. 2d at 364-65 (holding that failure to raise a legal objection to the award of attorneys' fees constituted concession to Panel's authority to award such fees). Mr. Sankin and Augustus both made a demand for attorneys' fees in their respective pleadings and neither party objected to the demands prior to the hearing or before the hearing closed. Thus, both parties acquiesced to the Panel's authority to award attorneys' fees.

We believe the Panel also possesses the authority to award attorneys' fees because Claimant has engaged in frivolous conduct. New York Rules of Court § 130-1.1(a)-(c) provides that such fees may be awarded if the adversary engages in frivolous conduct. These Rules define a frivolous action as one that (1) is completely without merit in law and cannot be supported by a reasonable argument for an extension, modification or reversal of existing law; (2) is undertaken primarily to delay or prolong the resolution of the litigation, or to harass or maliciously injure another; or (3) asserts material factual statements that are false. As stated in summation, we believe that Augustus's claims are completely without merit, vindictive, malicious, and, above all, frivolous. Should Mr. Sankin prevail, he is entitled to legal fees and expenses.

## V.    CONCLUSION

In conclusion, we respectfully urge the Panel to (1) apply the Statute of Frauds to Augustus's Claim on the grounds that there was no surprise or prejudice; (2) disregard the pejorative characterization of Mr. Sankin as having engaged in improper conduct fifteen years ago; and (3) award attorneys' fees and expenses to the prevailing party.

DOCSNY-254805v03

Dated: June 25, 2007

Respectfully submitted,

By: _Ira Lee Sorkin_ / with permission by _[signature]_
Ira Lee Sorkin, Esq.


DICKSTEIN SHAPIRO LLP
1177 Avenue of the Americas
New York, NY   10036
(212) 277-6500

*Counsel for Respondent Andrew C. Sankin*

12

**EXHIBIT C**

NATIONAL ASSOCIATION OF SECURITIES DEALERS
ARBITRATION PROCEEDING – NEW YORK CITY

| | |
|---|---|
| AUGUSTUS CAPITAL LLC, ) | NASD Arbitration No. 05-02528 |
| ) | |
| Claimant, ) | |
| ) | |
| v. ) | |
| ) | |
| ANDREW C. SANKIN ) | |
| ) | |
| Respondent. ) | |

## AUGUSTUS CAPITAL, LLC'S POST-ARBITRATION BRIEF

STEWART OCCHIPINTI, LLP
Attorneys for Claimant
Augustus Capital LLC
65 West 36th Street, 7th Floor
New York, New York 10018
(212) 239-5500

Claimant Augustus Capital LLC ("Augustus") respectfully submits this post-arbitration brief limited to the three issues specified by the arbitration panel: (a) whether the Statute of Frauds precludes Claimant Augustus Capital LLC ("Augustus") for pursuing its claims for either placement or marketing fees against Respondent Andrew Sankin ("Sankin") under the parties' February, 1999 verbal agreement (the "Agreement")[1]; (b) what inferences can be drawn from the fact that Sankin was an unindicted co-conspirator in the federal criminal action brought by Special Prosecutor Arlin Adams entitled *United States v. Deborah Gore Dean*; and (c) whether either Augustus or Sankin is entitled to recover attorneys' fees.

## I.    THE STATUTE OF FRAUDS

We contend that Sankin waived any affirmative defense based on the Statute of Frauds as a result of his failure to raise it in either his Answer or Corrected Answer. *See AM Cosmetics Inc. v. Solomon,* 67 F. Supp. 2d 312, 319 (S.D.N.Y. 1999) (holding that defendants had waived Statute of Frauds defense by failing to plead it in their answer).    Because Sankin never raised the Statute of Frauds defense, Augustus did not issue the type of broad discovery that parties typically issue when a Statute of Frauds defense is raised – particularly on non-parties – to locate documents signed by the "party to be charged."    However, if the panel permits Sankin to belatedly raise the Statute of Frauds defense, Augustus contends that New York law will not apply to all aspects of the Agreement.    Sankin incorrectly assumes that New York law will apply to the entire Agreement, and does not address the law of Maryland, where Sankin resided during the relevant period, or Washington D.C., where Sankin maintained his office for Perceptive Life Sciences and conducted all of his business activities, including those for which Augustus is entitled to compensation under the Agreement.

---

[1]   Sankin does not assert that the Broker Dealer Fee is barred by the Statute of Frauds.  Indeed, this fee was due for the period that Sankin held his license at Augustus, which could be more or less than one year.

There is a conflict among the laws of New York, Maryland and the District of Columbia regarding the application of the Statute of Frauds. Under New York General Obligation Law § 701(10), "a contract to pay compensation for services rendered in ... negotiating the purchase, sale, exchange, renting or leasing ... of a business opportunity" is "void, unless it or some note or memorandum thereof be in writing and subscribed by the party to be charged therewith, or by his lawful agent." Neither the Statutes of Frauds codified in Maryland nor the District of Columbia contain a similar prohibition against oral contracts to pay compensation for services rendered for "business opportunities" that otherwise satisfy the Statute of Frauds (e.g., could be performed within one year). (Copies of the New York, Maryland and District of Columbia Statutes of Frauds are attached as Exhibit A).

In contract cases like this one, the New York Court of Appeals has held that the "center of gravity" or "grouping of contacts" analysis is to be applied to determine choice of law in matters where there is a conflict between jurisdictions' laws. *Matter of Allstate Ins. Co. (Stolarz)*, 81 N.Y.2d 219, 226, 597 N.Y.S.2d 904, 613 N.E.2d 936 (1993). In *Matter of Allstate (Stolarz)*, the New York Court of Appeals listed several factors which should be considered in a conflict of law analysis in a contract case. These include "the place of contracting, negotiation and performance; the location of the subject matter of the contract; and the domicile of the contracting parties." 81 N.Y.2d at 227 (citing Restatement (Second) of Conflict of Laws, § 188(2)). The chart below reflects the application of New York conflict of law analysis to the multi-faceted contract in this case.

|  | Marketing Fee Agreement | Broker Dealer Agreement | Placement Fee Agreement |
|---|---|---|---|
| Place of contracting | NY, MD, DC | NY, MD, DC | NY, MD, DC |
| Place of Negotiation | NY, MD, DC | NY, MD, DC | NY, MD, DC |

| Place of Performance | Sankin placed investors in various hedge funds from his home in MD or his office at Perceptive in DC. | NY (the office from which Augustus provided the broker-dealer platform to Sankin). | NY (the location of Augustus) or the location of the hedge fund manager. For Perceptive, this was NY. |
|---|---|---|---|
| Location of Subject Matter of the Contract | Because the subject matter of the contract is the investors listed on Augustus' database, the location of the subject matter is worldwide. | NY | NY and DC (the location of Perceptive's offices) |
| Domicile of Contracting Parties | NY, MD | NY, MD | NY, MD |

Because each of the three components of the Agreement – payment of the Marketing Fee, the Broker-Dealer Fee and the Placement Fee – could potentially be fulfilled within one year, the Statutes of Frauds in both Maryland and the District of Columbia would not preclude any of the three components of Augustus' claim.   If the arbitration panel applies New York law to the Placement Fee, Augustus concedes that New York's Statute of Frauds may bar this claim because there does not appear to be a writing signed by Sankin evidencing the agreement to pay a Placement Fee.[2]

The Marketing Fee is governed by the law of the District of Columbia.   Of all of the factors, the place of performance is the most significant and Sankin performed the majority of his marketing services from Perceptive's offices in Washington, D.C.  Yet, even if the panel concludes that New York law should apply to the Marketing Fee and not the law of the District of Columbia, there are numerous documents in the record supporting and corroborating the fact

[2]   Augustus has calculated the Placement Fee at $4,535,166 through December 31, 2006.  In the event Sankin prevails in his arbitration against Perceptive, Augustus asserts that it has a claim to 33.33% of the award going forward.

that the parties agreed that Augustus was entitled to receive a percentage of the compensation paid to Sankin attributable to investors with a nexus to Augustus' database for as long as those investors remained in Perceptive, Potomac, Delray, Mosaic or any other hedge fund in which Sankin placed such investors, including:

1.  Monthly statements from Sankin reflecting that Abeshouse received a portion of Sankin's compensation attributable to investors from the Augustus database. *See e.g.* C28, C29, C32, R40, R89.

2.  Documents signed by Sankin reflecting that his compensation from all sources – hard or soft dollars – flowed through Augustus, and that the parties' agreement encompassed marketing fees, *see e.g.* C5, C-16, C19, C43, R18, R36, and Sankin's testimony respecting this point.

3.  The June 21, 2002 memorandum authored by Sankin to Perceptive's lawyer, William Natbony, in which Sankin states that, effective February 2002, Sankin's compensation was no longer based on trading commissions but, instead, was paid based on a defined percentage of the Net Asset Value of interest of investors attributable to Sankin (R. 36). Net Asset Value calculations are used for management fee and performance fee calculations, not "soft dollar" trading commission payments.

4.  Documents reflecting that Augustus was identified and characterized as one of Sankin's third party marketing intermediaries, as evidenced by Abeshouse's inclusion on Sankin's marketing agent spreadsheets. *See e.g.* C-23, C26, C27.

5.  Documents reflecting that the template Selling Agreement that Augustus provided to Sankin, which he used numerous times with multiple managers besides Perceptive, included a provision stating that Sankin, the Selling Agent, was entitled to be paid "for so long as the investor attributed to the Selling Agent remains in the Fund …" *See e.g.* C39, C40, C41. Both George Mazin and Elliot Weissbluth testified that third party marketing intermediaries commonly were paid as long as the investors remained in the fund (although Mr. Mazin testified that there were variations of this agreement as well). Moreover, Sankin himself, in his arbitration against Perceptive, seeks to enforce a variation of this agreement and receive a percentage of the assets under management for as long as there are investors in Perceptive.

6.  Documents reflecting the manner in which Sankin paid third party marketing intermediaries, such as Yves Byrde (pursuant to Sankin's and Byrde's oral agreement), including the fact that Sankin (or Perceptive) paid such intermediaries as long as their investors stayed in Perceptive. *See e.g.* C25, C31.

Evidence also demonstrates that verbal agreements are common in the financial services industry. In fact, in another arbitration proceeding in which Arbitrator Bach participated, the decision, in upholding a verbal agreement to share attorneys' fees, stated:

> In an industry where many of us make transactions each and every working day valued in the tens of thousands of dollars to millions of dollars on our word alone, this industry is truly one where it is expected that "your word is your bond." Thus, if an oral agreement existed between the securities industry parties in this case, it is a valid binding agreement.

*HD Brous & Co., Inc. v. Dorman,* NASD Case No. 02-05467. Indeed, in addition to oral agreements with third party marketing intermediaries, Sankin had a single Selling Agreement with Perceptive's domestic fund, but had several verbal agreements concerning other Perceptive funds, such as its offshore fund and domestic Qualified Purchaser fund, and he was paid substantial sums of money – millions of dollars – pursuant to these verbal agreements. *See e.g.* R18 and R36.

## II.  THE SIGNIFICANCE OF THE FACT THAT SANKIN WAS AN UNINDICTED CO-CONSPIRATOR

From Sankin's testimony and the argument of his counsel, the arbitration panel would be forgiven if it thought that an "unindicted co-conspirator" is merely a label given by the Government to a federal witness to circumvent the hearsay rule in a criminal case. That is far from the full story.

In general, an "unindicted co-conspirator" is a person that was obviously involved to some degree in the commission of the crime but whom the Government, for whatever reason, has elected not to prosecute but to utilize as a witness at the criminal trial. For example, in *United States v. Dean,* one of the 17 criminal convictions generated in connection with the eight and one-half year investigation into favoritism at the Department of Housing and Urban

Development ("HUD"), the Government charged Deborah Gore Dean, a high-ranking HUD

official, of violating 18 U.S.C. 371. (A copy of the decision is attached as C38).    To establish a

conspiracy under 18 U.S.C. § 371, the Government had to prove: (1) Dean agreed with at least

one other person to defraud the United States; (2) Dean knowingly participated in the conspiracy

with the intent to defraud the United States or to commit an offense against the United States;

and (3) at least one overt act was committed in furtherance of the conspiracy. *Id.,* at 4 (citing

*United States v. Treadwell,* 760 F.2d 327, 333 (D.C. Cir. 1985), *cert. denied,* 474 U.S. 1064

(1986)).  Sankin, a friend of Dean's, was one of the persons with whom Dean agreed to defraud

the United States. *Id.,* at 8-12.  Sankin, then only a few years after graduating law school, was

paid more than one hundred thousand dollars in connection with his participation in this illegal

scheme. *Id.,* at 9, 11.  As reflected in the opinion of the United States Court of Appeals for the

District of Columbia, Sankin testified at length against Dean.  The court held that the evidence

"was sufficient to establish that Dean knowingly participated in a conspiracy to facilitate

decisions favorable to the developers of these projects, and thus to Sankin." *Id.,* at 12.

Unindicted co-conspirators play an important role in prosecutions but they are hardly a

squeaky clean fraternity.  For example, in a press release issued by the United States Attorney

for the Central District of California describing the guilty plea of a defendant charged with

multiple acts of fraud involving airplane parts, one of the unindicted co-conspirators was

described as a person who would supervise "whatever work was necessary on these surplus or

used aircraft parts ... includ[ing] removing data plates, stamps and serial numbers; adding false

data plates, stamps and serial numbers; and creating fraudulent traceability documentation. *See*

Exhibit B.

Similarly, in a press release issued by the United States Attorney for the Northern District of California describing the sentencing of a man found guilty of committing scores of armed robberies, the unindicted co-conspirator was described as the person who "was parked nearby, prepared to transport the weapons and the stolen merchandise after the robbery." *See* Exhibit C.

As Stuart Taylor of the American Lawyer explained in an interview regarding the Whitewater investigation:

> MARGARET WARNER: Bruce Lindsey is the deputy White House counsel and a longtime friend and adviser to President Clinton. He was the treasurer for then Governor Clinton's 1990 reelection campaign. It is that association which interests prosecutors in the current Whitewater-related trial in Little Rock. We get more on this now from NewsHour regular Stuart Taylor, legal reporter for the American Lawyer and Legal Times.  Stuart, before we get into this case, explain: what is an unindicted co-conspirator? In other words, in what cases would a prosecutor choose to name some unindicted co-conspirator rather than indict them?

> STUART TAYLOR, The American Lawyer: The prosecutor is saying in essence in court--and they haven't said it yet by the way--but they apparently will--that *we believe this man was part of the criminal conspiracy, along with the people who are on trial*. We haven't indicted him but the relevance of that for the purposes of the trial is that lets them get in more evidence about the unindicted co-conspirators or the alleged unindicted co-conspirator's out-of-court statements than they otherwise could. It's a way around the hearsay rule.

*See* Exhibit D (emphasis supplied).

The Government recognizes that there is a stigma attached to being publicly identified as an unindicted co-conspirator.  The practice of naming individuals as unindicted co-conspirators in an indictment charging a criminal conspiracy has been severely criticized.  *See, e.g., United States v. Briggs*, 514 F.2d 794 (5th Cir. 1975) ("*Briggs*").  The United States Attorneys' Manual (USAM) explicitly states that, in the absence of some significant justification, federal prosecutors generally should not identify unindicted co-conspirators in conspiracy indictments. *See* USAM 9-16.500, 9-27.760.  It further states that, with respect to the trial, "the person's

7

identity and status as a co-conspirator can be established, for evidentiary purposes, through the introduction of proof sufficient to invoke the co-conspirator hearsay exception without subjecting the person to the burden of a formal accusation by a grand jury." USAM 9-11.130. Likewise, the United States Attorneys' Manual states:

> In all public filings and proceedings, federal prosecutors should remain sensitive to the privacy and reputation interests of uncharged third-parties. In the context of public plea and sentencing proceedings, this means that, in the absence of some significant justification, it is not appropriate to identify (either by name or unnecessarily-specific description), or cause a defendant to identify, a third-party wrongdoer unless that party has been officially charged with the misconduct at issue.

USAM 9-27.760 (emphasis added).

Apparently Special Prosecutor Adams either disregarded the concerns about publicly identifying Sankin as a co-conspirator or, much more likely, concluded that there was "significant justification" for doing so, because newspapers, including The New York Times, reported Sankin's involvement in the HUD scandal well before he testified against Dean at trial. *See* Exhibit E.

That said, Augustus introduced evidence of Sankin's involvement in the HUD scandal not to impeach his character or credibility but to establish that he had a checkered business history, was not the "very successful businessman" and "lawyer" he claimed to be in February, 1999, and that this was one of the reasons that he jumped at Augustus' offer to provide employment in February, 1999 and eagerly accepted each of the various components of Augustus' compensation structure. However, as Abeshouse testified, had Augustus known of Sankin's involvement in the HUD scandal, it would not have allowed Sankin to place his license at Augustus.

8

### III.    THE PARTIES ARE NOT ENTITLED TO ATTORNEYS' FEES

As Augustus' counsel stated when the issue of attorneys' fees was first raised by the panel at the hearing, neither Augustus nor Sankin can bear its legal burden of demonstrating that there is a legal basis for the arbitration panel to award attorneys' fees in this case.[3]    First, NASD rules only provide for attorneys' fees in employment discrimination cases. *See Schaad v. Susquehanna Capital Group,* 2004 U.S. Dist. LEXIS 15772 at *16-17 (S.D.N.Y. Aug. 19, 2004) (stating that NASD Rule 10215 providing for attorneys' fees is part of a series of rules governing the arbitration of employment discrimination claims).  Second, there was no agreement between the parties, written or oral, that provides for the award of attorneys' fees in the arbitration.  Third, neither Augustus nor Sankin has or can carry its burden of demonstrating that the other side litigated this action in bad faith. *See Asturiana de Zinc Mktg., Inc. v. LaSalle Rolling Mills, Inc.,* 20 F. Supp. 2d 670, 674-75 (S.D.N.Y. 1998); *Sammi Line Co. v. Altaman Navegacion, S.A.,* 605 F. Supp. 72 (S.D.N.Y. 1985) ("the burden is on [party seeking to confirm an award of attorney's fees] to demonstrate that an award of attorneys' fees was included within the scope of the arbitrable issues"); *Todd Shipyards Corp. v. Cunard Line, Ltd.,* 943 F.2d 1056, 1064 (9th Cir. 1991) (recognizing bad faith exception and finding that arbitrator may award attorneys' fees when "the losing party has acted in bad faith, vexatiously, wantonly, or for oppressive reasons"); *Interchem Asia 2000 PTE Ltd. v. Ocean Petrochemicals AG,* 373 F. Supp. 2d 340, 355 (S.D.N.Y. 2005) (same).

Sankin's compensation from hedge fund activities totals millions of dollars, including $7.4 million after July 1, 2004, none of which has been shared with Augustus. As set forth in the Statement of Claim, Augustus' claim concerns the terms of an oral agreement reached seven

---

[3]    In their initial submissions, both parties requested attorneys' fees, in whole or in part.  Augustus, for example, in its WHEREAS clause of its Statement of Claim, requested "the costs of initiating and prosecuting this arbitration, including attorneys' fees and costs."

years ago, when the parties' relationship was in its infancy.   The parties sought and participated
in mediation at the end of July, 2004, after the break-up of their multi-year relationship.  Only
after months of discussions between the parties (and their counsel) and after mediation failed did
Augustus commence this action.   In contrast to the alleged U-5 issue, Augustus did not construct
a false dispute as a strategic ploy for use during cross-examination in an arbitration proceeding.[4]

      Sankin's position that Augustus' claims are frivolous is completely without merit.
Sankin's paperwork production on revenue attribution/sharing, sent monthly to Augustus,
memorializes the incontrovertible fact that the parties had an agreement respecting the Marketing
Fee.  Sankin himself wrote emails confirming that the broker-dealer component was "an
essential" part of the parties' understanding.  Elliot Weissbluth testified that registered
representatives often pay a flat percentage of their compensation to the broker-dealer.   He
specifically testified about requiring his extremely qualified registered representatives to pay the
broker dealer a fee of 15% of the gross revenue.  George Mazin testified that he had not heard of
a case where a registered representative generating millions of dollars through his broker-dealer
would not pay the broker-dealer a cent – a potential result if the terms of the Agreement were the
ones suggested by Sankin in this proceeding.   Steve Guzik, the accountant from Eisner,
conceded that conservative accounting practices do not require an accountant to record deferred
income that is contingent on a future event and that, ultimately, how income is recorded is left to
the judgment of the accountant.   Sankin testified that he is litigating against Perceptive and

---

[4]   Sankin conceded that he retained his esteemed and highly experienced securities lawyer in mid-July 2004, prior
to the U-5's issuance.  At no time prior to the issuance of the U-5 did Sankin or his counsel contact Augustus to
discuss the alleged U-5 issue. Nor did Sankin or his counsel contact Augustus after the U-5 was distributed. To this
day, no one has ever contacted Augustus to inquire about the information on the U-5, and Sankin obviously has not
been damaged. (Not only did he earn in excess of $7 million after the U-5 was processed, but he also testified that
he presently has a job offer at another hedge fund).  Indeed, the information on the U-5 is entirely correct. The first
time Sankin objected to the U-5 was when Augustus commenced this arbitration.   While the U-5 issue is a side-
show, we do not maintain that Sankin has acted "in bad faith, vexatiously, wantonly, or for oppressive reasons."

arguing that he is entitled to be paid a percentage of Net Assets under management for as long as Perceptive has assets – a compensation structure vastly broader in scope than his Marketing Fee agreement with Augustus (but philosophically identical to Augustus' Marketing Fee argument against him). Also, Sankin conceded in an email that he did not ascribe "bad motives" to Abeshouse, and also admitted that, at a minimum, the parties had a disagreement as to whether commissions would continue to be paid to Augustus if Sankin changed broker-dealers. *See* R62. Regardless of the outcome, there is no support for determining that either party litigated this case in bad faith.

11

## CONCLUSION

Based on the evidence adduced at the hearing and found elsewhere in the record,

Augustus respectfully requests that the arbitration panel award damages in its favor in

accordance with its demand(s) in the Statement of Claim.[5]

Dated: New York, New York
       June 25, 2007

Respectfully submitted,

**STEWART OCCHIPINTI, LLP**

By: _____
Charles A. Stewart, III
1350 Broadway, Suite 2200
New York, New York 10018
(212) 239-5500
*Attorneys for Augustus Capital LLC*

---

[5]    As of December 31, 2006, Sankin's income from (primarily) Perceptive from inception was approximately $11,868,034, of which Augustus received approximately $337,000, or 2.84%, for a Marketing Fee. Sankin earned $18,204 in 2000; $474,587 in 2001; $1,116,502 in 2002; $1,256,925 in 2003; $2,995,165 in 2005; and $2,838,696 in 2006. Because Sankin did not provide Augustus with complete information for 2004, the record of Sankin's compensation for that year is incomplete. However, based on the information that Augustus had for the period in which Sankin was employed at Augustus (as reflected in the 1099s) and Sankin's income of $273,500 in May, 2004 and assuming 10% net performance growth in the period after he left Augustus, Augustus estimates Sankin's total earnings for 2004 at $3,167,955 ($1,161,580 via Augustus for 2004 through May 31, 2004). Augustus has calculated the Marketing Fee owed to it for the 29 month period from August 2004 through December 2006 at $406,686 ($56,776 x .247 x 29 as per C35). Augustus also is owed FPA fees as part of the Marketing Fee (see Statement of Claim) for much of the period during which Sankin was employed at Augustus, which Sankin did, in fact, pay from February 2004 through May 2004 at approximately $1,000 per month. The Marketing Fee calculations that Augustus provided (C35) did not provide a calculation for the FPA fee of approximately $1,000 per month. R36, Sankin's memorandum to his lawyer, states that Joseph Edelman unilaterally reduced Sankin's compensation in December 2001, which is when Sankin unilaterally and improperly reduced Augustus' compensation. *See* Statement of Claim, ¶¶ 42-47. For the period January 2002 through February 2004 and June 2004 through December 2006, the FPA fee totals $61,000. Augustus calculates the interest due on the Marketing Fee at approximately $35,000 based on compound annual 5% interest rates. Accordingly, the Marketing Fee, inclusive of the FPA fee and interest, totals $502,686 ($406,686 plus $61,000 plus $35,000), through December 2006. If Sankin is successful in his arbitration against Perceptive, Augustus would be entitled to Marketing Fees from January 1, 2007. The Broker-Dealer Fee encompasses 20% of Sankin's earnings during the period that he held his license at Augustus. Through May 31, 2004, Sankin's compensation paid through Augustus was $4,027,798 (as per Augustus' 1099s) plus $344,080 (from June 1, 2004 through July 8, 2004 resignation, as extrapolated from Sankin's May 2004 income of $273,500 and assuming zero growth in the period until Sankin's termination totaling $371,878). Augustus has calculated the Broker-Dealer Fee at $874,376 (20% of $4,371,878), plus $230,000 in interest (compound annual 5% interest on accrued Broker-Dealer fees from inception until present). Sankin has never disputed the accuracy of Augustus' damage calculations as reflected on C35, which were introduced as an exhibit in April, 2007, during the first period of the arbitration.

**EXHIBIT D**

SUPREME COURT OF THE STATE OF NEW YORK — NEW YORK COUNTY

PRESENT: **JUDITH J. GISCHE, J.S.C.**                                    PART 10

Index Number : 110816/2007

SANKIN, ANDREW C.

vs

AUGUSTUS CAPITAL, LLC

Sequence Number : 001

CONFIRM AWARD

| | |
|---|---|
| INDEX NO. | _____ |
| MOTION DATE | _____ |
| MOTION SEQ. NO. | _____ |
| MOTION CAL. NO. | _____ |

The following papers, numbered 1 to _____ were read on this motion to/for _____

| | PAPERS NUMBERED |
|---|---|
| Notice of Motion/ Order to Show Cause — Affidavits — Exhibits ... | _____ |
| Answering Affidavits — Exhibits _____ | _____ |
| Replying Affidavits _____ | _____ |

Cross-Motion:  ☐ Yes    ☐ No

Upon the foregoing papers, it is ordered that this ~~motion~~

motion (s) and cross-motion(s) decided in accordance with the annexed decision/order of even date.

**FILED**

OCT 01 2007

NEW YORK
COUNTY CLERK'S OFFICE

Dated: Sept 18, 2007

_____
**JUDITH J. GISCHE, J.S.C.**    J.S.C.

Check one:  ☒ FINAL DISPOSITION    ☐ NON-FINAL DISPOSITION

Check if appropriate:    ☐ DO NOT POST    ☐ REFERENCE

MOTION/CASE IS RESPECTFULLY REFERRED TO JUSTICE FOR THE FOLLOWING REASON(S):

Supreme Court of the State of New York
County of New York: Part 10

\---------------------------------------------x

ANDREW C. SANKIN,

                      Petitioner,

     -against-

AUGUSTUS CAPITAL, LLC,

                    Respondent.

\-------------------------------------------x

Decision/Order
Index No.:    110816/07
Seq. No.:     001

Present:
Hon. Judith J. Gische
          J.S.C

Recitation, as required by CPLR § 2219 [a], of the papers considered in the review of this/these motion(s):

| Papers | | Numbered |
|---|---|---|
| Pet's Notice of Petition | . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 1 |
| Pet's Verified Petition, w/Exh. | . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 2 |
| Pet's Acknowledgment of Service (JWH) | . . . . . . . . . . . . . . . . . . . . . . . . | 3 |

**FILED**

OCT 01 2007

NEW YORK
COUNTY CLERK'S OFFICE

Upon the foregoing papers, the decision and order of the court is as follows:

This is plaintiff's petition to confirm the award of the NASD arbitrators dated May 26, 2004 in the matter of <u>Augustus Capital LLC v. Andrew C. Sankin</u>, Case No. 05-02528. . The award was rendered by an arbitration panel (the "Panel") comprised of Philip M. Mandel, Esq., Gilbert F. Bach, Esq., and Lionel C. Bander and is dated July 26, 2007.

This action was commenced in the manner provided for in CPLR § 403. A copy of the notice of petition and petition were personally delivered to both respondent and its representative in the underlying arbitration on August 10 and August 9, 2007, respectively. CPLR § 311-a. A copy of the award is included as an exhibit to the petition. Though served, respondent has not appeared or answered the petition.

Page 1 of 2

Accordingly, the petition is granted in all respects.

*IN ACCORDANCE HEREWITH, IT IS HEREBY*

ORDERED that the arbitration award of the NASD dated July 26, 2007 is hereby CONFIRMED in its entirety; and it is further

Any requested relief not expressly addressed herein has been nonetheless been considered by the court and is denied.

This shall constitute the Decision and Order of the Court.

Dated: New York, New York
      September 18, 2007

So Ordered

_____
HON. JUDITH J. GISCHE, J.S.C.

FILED

OCT 0 1 2007

NEW YORK
COUNTY CLERK'S OFFICE

**EXHIBIT E**



B199— [illegible]

**Supreme Court of the State of New York**
**County of WESTCHESTER**

RECEIVED

OCT 16 2007
TIMOTHY C. IDONI
COUNTY CLERK
COUNTY OF WESTCHESTER

ANDREW C. RANKIN

*Plaintiff(s)*

against

MARK ABESHOUSE
AND
RHONDA LEONARD

*Defendant(s)*

Index No. 20980-07
Date purchased 10-12-07

Plaintiff(s) designate(s)

County as the place of trial.

The basis of the venue is.

*Amended*
**Summons**

DEFENDANTS
Plaintiff(s) reside(s) at
110 Pondview Lane
New Rochelle, NY   10804
County of
Westchester

To the above named Defendant(s)

**You are hereby summoned** to answer the complaint in this action and to serve a copy of your answer, or, if the complaint is not served with this summons, to serve a notice of appearance, on the Plaintiff's Attorney(s) within   20   days after the service of this summons, exclusive of the day of service (or within 30 days after the service is complete if this summons is not personally delivered to you within the State of New York); and in case of your failure to appear or answer judgment will be taken against you by default for the relief demanded in the complaint.

Dated,    October 10, 2007
New York, NY

Attorney(s) for Plaintiff

Office and Post Office Address

Defendant's address:
MARK ABESHOUSE
110 Pondview Lane
New Rochelle, NY   10804

RHONDA LEONARD
110 Pondview Lane
New Rochelle, NY   10804

DICKSTEIN SHAPIRO LLP
1177 Avenue of the Americas
New York, NY   10036

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF WESTCHESTER

---

                                                    x
ANDREW C. SANKIN,                                   :    Index No.: 20980-07
                                                    :    Date Purchased: 10-12-07
                Plaintiff,                          :
                                                    :
        v.                                          :    COMPLAINT          RECEIVEI
                                                    :
MARK ABESHOUSE AND                                  :    JURY TRIAL DEMANDED OCT 12 2007
RHONDA LEONARD.                                     :
                                                    :                TIMOTHY C. IDONI
                Defendants.                         :                 COUNTY CLERK
                                                    :              COUNTY OF WESTCHESTI
                                                    x

---

        Plaintiff Andrew C. Sankin, by his attorneys, Dickstein Shapiro LLP, as and for his

complaint against the above-named Defendants, states as follows:

### NATURE OF ACTION

        1. This is an action for damages stemming from the Defendants' malicious prosecution

of an arbitration against Plaintiff Andrew C. Sankin ("Sankin").

        2. Augustus Capital LLC ("Augustus") through its sole principal, Defendant Mark

Abeshouse ("Abeshouse") and its attorney, Defendant Rhonda Leonard ("Leonard"), maliciously

instituted a National Association of Securities Dealers ("NASD") (now the Financial Industry

Regulatory Authority ("FINRA")) arbitration (the "NASD Arbitration") against Sankin, claiming

that Sankin owed Augustus various fees and commissions stemming from Sankin's affiliation

with Augustus as a registered representative.

        3. Defendants were or should have been aware that the claims made against Sankin in

the NASD Arbitration lacked probable cause. Instead, the NASD Arbitration was part of a

continuing scheme by Defendants to unilaterally and retroactively impose onerous new terms on

a commission-sharing agreement (the "Agreement") between Sankin and Augustus under which

Sankin shared with Augustus a certain fixed amount of the commissions he received for selling interests in the biotechnology hedge funds Perceptive Life Sciences Fund, L.P., Perceptive Life Sciences Qualified Fund, L.P., and Perceptive Life Sciences Offshore Fund LTD (collectively, "Perceptive").

4.    Abeshouse and Leonard bore a grudge against Sankin because of his tremendous financial success in the hedge fund world and their ensuing unhappiness with the Agreement, which Sankin refused to renegotiate. As evidence of the spite exhibited by Abeshouse and Leonard toward Sankin were the defamatory statements made on Sankin's Form U5 falsely suggesting that Sankin was terminated from Augustus as a result of "compliance" issues.

5.    The arbitration panel denied all of Augustus's claims and found that the statements made on Sankin's Form U5 were defamatory. The panel recommended expungement of the Reason for Termination section of Sankin's Form U5 filed by Augustus and the change of the Reason for Termination to "voluntary."

6.    In addition to the great physical, psychological, and financial toll of defending himself in the NASD Arbitration, the NASD Arbitration adversely affected Sankin's recovery from cancer treatment that he was undergoing at the time the NASD Arbitration was instituted. The NASD Arbitration also damaged Sankin's relationship with Joseph Edelman ("Edelman"), Managing Member of Perceptive Advisors, LLC ("Perceptive Advisors") and was a contributing factor in Sankin's removal by Edelman as an officer of Perceptive Advisors in December 2006.

**JURISDICTION AND VENUE**

7.    The Court has venue pursuant to N.Y. CPLR § 503(a) because Defendants reside in Westchester County.

2

## PARTIES

8.  The Plaintiff is a resident of the State of Florida and resides at 6955 Queenferry Circle, Boca Raton, FL 33496.

9.  Upon information and belief, Defendant Abeshouse is a resident of the State of New York, County of Westchester, and resides at 110 Pondview Lane, New Rochelle, NY 10804. Abeshouse is the sole principle and Managing Member of Augustus.

10.  Upon information and belief, Defendant Leonard is Abeshouse's wife and Augustus's General Counsel, is a resident of the State of New York, County of Westchester, and resides at 110 Pondview Lane, New Rochelle, NY 10804.

## NON-PARTY

11.  Augustus is a FINRA-member broker-dealer firm with its principal place of business in Westchester County, New York State at 550 Mamaroneck Avenue, Suite 508, Harrison, NY 10528.

## FACTS

12.  Sankin became a registered representative of Augustus in February 1999.

13.  Sankin entered into a Selling Agreement with Perceptive on March 16, 2000 under which Sankin agreed to sell interests in Perceptive. For most of the duration of the Agreement, Sankin was compensated with a certain number of "basis points" of the funds invested in Perceptive that were attributable to his marketing efforts.

14.  In exchange for allowing Sankin to "park" his broker-dealer license and for providing Sankin with a list of prospective investors, Augustus shared a certain fixed amount of the commission that Sankin received from Perceptive attributable to each specific investor that the parties agreed had a connection to Augustus. Under the Agreement, the commission shared

3

constituted the entirety of the compensation covered under the Agreement. Furthermore, the Agreement provided that Augustus would share in commissions paid to Sankin only for the period during which Sankin was registered with Augustus.

15. In most cases, Sankin and Abeshouse negotiated the number of "basis points" that Augustus was to receive for each investor or group of investors. As Sankin's commission was reduced by Perceptive, Sankin and Augustus in turn negotiated reduced commission rates due to Augustus for future investments.

16. Over the five and one-half years during which Sankin was a registered representative of Augustus, First New York Securities, LLC ("First New York"), which executed a substantial portion of Perceptive's securities trades, sent Abeshouse a monthly statement of commissions earned by Sankin from Perceptive along with a check for the total amount of the commissions. After Augustus deducted its share of the commissions under the Agreement, Abeshouse sent the remainder of the commissions to Sankin. Sankin also sent Abeshouse a monthly statement detailing the commissions he earned from Perceptive as well as a detailed accounting of Augustus's share of the commissions.

17. Over the course of the entire Agreement, the amount of the commissions retained by Augustus totaled approximately $336,473. During that period of time, Sankin's earnings from Perceptive dramatically increased.

18. Abeshouse did not object to the commission statements for 46 consecutive months. In a series of e-mails beginning in or around early 2004, Abeshouse began expressing his displeasure with the Agreement and indicated to Sankin that he sought to renegotiate it. In these e-mails, Abeshouse acknowledged that he and Sankin had an agreement, but said that he wanted to alter it because the amount he was receiving under the Agreement had become insulting to

4

him now that Sankin was experiencing great success in the hedge fund world. Abeshouse took this position notwithstanding his expressed view that he knew that he and Sankin "had a deal," which he was "reluctant to go back on."

19. After repeated pleas by Abeshouse to renegotiate the Agreement, Sankin agreed to pay Augustus a fixed additional amount of $1,000 per month to compensate Augustus for claimed additional overhead expenses, although Augustus never provided any documentation or specifics for such expenses. Aside from this additional amount, Sankin never agreed to pay any other additional compensation to Augustus under the Agreement.

20. Despite Sankin's goodwill gesture in offering additional compensation, Abeshouse remained unhappy with the Agreement. Abeshouse expressed this continuing resentment through e-mails in which he expressed displeasure that Sankin was making significantly more money than Abeshouse had expected.

21. In June 2004, Leonard wrote a purportedly independent opinion letter ("Opinion Letter") in which she acknowledged the existing agreement between Sankin and Abeshouse and advised Abeshouse to charge Sankin "additional fees" if Sankin did not agree to a new compensation agreement. In the letter, Leonard also advised Abeshouse that he should note on Sankin's Form U5 that he had compliance issues if Sankin did not agree to a new compensation structure.

22. On June 24, 2004, Augustus distributed a memorandum setting forth a new compensation schedule effective July 1, 2004 for registered representatives of Augustus.

23. Sankin refused to accept the new compensation schedule and resigned from Augustus on July 8, 2004.

5

24. Upon Sankin's resignation from Augustus, he became a member of Perceptive Advisors and ceased being paid under the Selling Agreement.

25. After Sankin resigned from Augustus, Aboshouse sent him several e-mails in which he made veiled threats with regard to Sankin's Form U5 unless Sankin reconsidered his resignation and accepted the new compensation structure.

26. When Sankin refused to reconsider his resignation, Aboshouse indicated on Sankin's Form U5 that Sankin was "permitted to resign" and wrote in the comments section that "'[a] dispute arose regarding Augustus Capital LLC's compliance policies resulting in the resignation of employee Sankin."

27. The statements on Sankin's Form U5 were completely and utterly false, and were included on Sankin's Form U5 in a blatant attempt to harm Sankin's future employment opportunities.

28. Following Sankin's resignation from Augustus, Aboshouse requested that Sankin continue to remit commissions to Augustus despite the fact that the Agreement provided for commission payments only as long as Sankin was a registered representative of Augustus. Sankin refused to continue paying commissions to Augustus after his resignation.

29. In 2005, Sankin was diagnosed with renal cell carcinoma and required immediate surgery to have his cancerous kidney removed. Defendants were aware of Sankin's condition.

30. One day before Sankin checked into the hospital to have his cancerous kidney removed, Defendants served Sankin with the Statement of Claim in the NASD Arbitration. Upon information and belief, Defendants knew that Sankin was scheduled for surgery on or around the day following service of the Statement of Claim.

6

31. Abeshouse and Leonard were extremely reluctant to agree to extensions of due dates in the NASD Arbitration to accommodate Sankin's post-operative recovery despite Sankin remaining in the hospital for an extended period of time after he suffered a life-threatening infection.

32. The NASD Arbitration took place between April 9-11, 2007 and June 12-14, 2007.

33. During the NASD Arbitration, Abeshouse and Leonard intentionally misrepresented, among other things, the nature of the Agreement with Sankin and falsely claimed that Sankin owed various fees and commissions, including a "Placement Fee," a "Marketing Fee," and a "Broker-Dealer Fee," which Defendants knew were not part of the Agreement.

34. During the NASD Arbitration in April 2007, in an off-record comment to Adam Weiss, one of Sankin's attorneys, Abeshouse stated, "I don't care if I win or lose, I just like to fight."

## FIRST CAUSE OF ACTION
### (Malicious Prosecution)

35. Sankin repeats and realleges the allegations set forth in paragraphs 1 through 34, as fully set forth herein.

36. On or about May 10, 2005, Augustus through Abeshouse and Leonard instituted the NASD Arbitration against Sankin, claiming that Sankin owed Augustus various fees and commissions, including a "Placement Fee," a "Marketing Fee," and a "Broker-Dealer Fee." Augustus also claimed that Sankin was obligated to continue paying commissions even after his resignation.

37. Defendants knew or should have known that their claims in the NASD Arbitration lacked any basis in fact. Previous to filing the action, Abeshouse, in various e-mails written to Sankin, contradicted the claims in the NASD Arbitration and acknowledged the true agreement

7

between himself and Sankin. In her Opinion Letter, Leonard also contradicted the claims in the NASD Arbitration and acknowledged the agreement between Abeshouse and Sankin.

38. The NASD Arbitration terminated in favor of Sankin on all counts. The arbitration panel also found that the statements made by Abeshouse on Sankin's Form U5 were defamatory. The panel recommended expungement of the Reason for Termination section of Sankin's Form U5 filed by Augustus and the change of the Reason for Termination to "voluntary."

39. Abeshouse and Leonard exhibited malice toward Sankin, as evidenced by their defamatory statements on Sankin's Form U5, their service of the Statement of Claim one day before Sankin's cancer surgery, and the correspondence between Abeshouse and Sankin in which Abeshouse expresses his displeasure with the Agreement. Abeshouse's malice toward Sankin is also demonstrated by his statement, "I don't care if I win or lose, I just like to fight."

40. As a direct, proximate result of Defendants' malicious prosecution, Sankin was forced to incur substantial costs, fees, and disbursements in defending against Defendants' vindictive pursuit of a frivolous arbitration. Also as a direct, proximate result of Defendants' malicious prosecution, Sankin's recovery from cancer was adversely affected. Furthermore, Defendants' malicious prosecution damaged Sankin's relationship with Edelman and was a contributing factor in Sankin's removal as an officer of Perceptive Advisors. As a direct and proximate result of Defendants' malicious prosecution, Sankin has suffered damages in an amount to be determined at trial but not less than $500,000.

WHEREFORE, Plaintiff respectfully demands judgment as follows:

A.    Against Defendant and in favor of Plaintiff for compensatory damages in the amount of $500,000 plus prejudgment interest pursuant to CPLR § 5001;

8

B.  Awarding to Plaintiff punitive/exemplary damages in the amount to be
    determined at trial;

C.  Awarding to Plaintiff the costs and disbursements of the action, including
    reasonable attorneys' fees; and

D.  Granting such other and further relief as this Court deems just and proper.

Dated:  New York, New York          Respectfully submitted,
        October 11, 2007
                                    DICKSTEIN SHAPIRO LLP

                            By:     _____
                                    Ira Lee Sorkin
                                    1177 Avenue of the Americas
                                    New York, New York 10036-2714
                                    Telephone: (212) 277-6500
                                    Facsimile: (212) 277-6501

DOCSNY-266812v04

6

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------X
ANDREW C. SANKIN,                                )
                                                 )
                        Plaintiff,               )        7:07-cv-10491-CLB
                                                 )
                                                 )
       -against-                                 )
                                                 )
MARK ABESHOUSE and RHONDA                        )        **CERTIFICATE OF SERVICE**
LEONARD,                                         )
                                                 )
                        Defendants.              )
                                                 )
-------------------------------------------------------X

     CHARLES A. STEWART, III, an attorney admitted to practice in the United
States District Court for the Southern District of New York, certifies, pursuant to 28
U.S.C. § 1746, under penalty of perjury, that on January 11, 2008, the attached Notice of
Motion, Declaration of Charles A. Stewart, III, with exhibits, and accompanying
memorandum of law was served upon all counsel in this action by: (1) electronically
filing the same with the Court pursuant to the rules of the United States District Court for
the Southern District of New York; and (2) emailing same to the counsel listed below at
the addresses provided by such counsel to the Court, to wit:

               Richard W. Signorelli, Esq.
               Law Office of Richard E. Signorelli
               799 Broadway, Suite 539
               New York, New York 10003
               rsignorelli@nycLITIGATOR.com

               Terence William McCormick, Esq.
               Mintz & Gold LLP
               470 Park Avenue South, 10th Floor North
               New York, New York  10016
               mccormick@mintzandgold.com

Dated: New York, New York
       January 11, 2008

                                _/s/_____
                               Charles A. Stewart, III (CS-7099)