Steven W. Gold (SG-3959)
Terence W. McCormick (TM-2713)
MINTZ & GOLD LLP
470 Park Avenue South
10th Floor North
New York, New York 10016-6819
(212) 696-4848
(212) 696-1231
gold@mintzandgold.com
mccormick@mintzandgold.com

*Attorneys for Plaintiff*
*Andrew C. Sankin*

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
------------------------------------------------------------X
ANDREW C. SANKIN,    :    7:07-cv-10491 (CLB)(MDF)
                              :
            Plaintiff,   :    **DECLARATION OF**
                              :    **TERENCE W. McCORMICK, ESQ.**
    -against-            :
                              :    **ECF CASE**
MARK ABESHOUSE and   :
RHONDA LEONARD,    :
                              :
            Defendants.  :
------------------------------------------------------------X

**TERENCE W. McCORMICK** makes the following Declaration under the penalty of perjury pursuant to 28 U.S.C. §1746, and states that the following is true and correct:

1. I am an associate of the law firm of Mintz & Gold LLP, counsel to Plaintiff Andrew C. Sankin in the above captioned action. I make this Declaration in opposition to the concurrently filed motions of the Defendants, Mark Abeshouse and Rhonda Leonard, to dismiss Plaintiff's complaint pursuant to Fed. R. Civ. P. 12(b)(6).

2.	Annexed to this Declaration as <u>Exhibit 1</u> is a true and correct copy of the Complaint in this action, which was filed in the Supreme Court of the State of New York, County of Westchester, and subsequently removed to this Court by the Defendants on or about November 20, 2007.

Dated: New York, New York
       February 11, 2008

                                              */s/ Terence W. McCormick*
                                              Terence W. McCormick

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF WESTCHESTER

|  |  |
|---|---|
| ANDREW C. SANKIN, | Index No.: 20980-07 |
|  | Date Purchased: 10-12-07 |
| Plaintiff, |  |
| v. | **COMPLAINT** |
| MARK ABESHOUSE AND RHONDA LEONARD, |  |
| Defendants. | **JURY TRIAL DEMANDED** |

Plaintiff Andrew C. Sankin, by his attorneys, Dickstein Shapiro LLP, as and for his complaint against the above-named Defendants, states as follows:

### NATURE OF ACTION

1. This is an action for damages stemming from the Defendants' malicious prosecution of an arbitration against Plaintiff Andrew C. Sankin ("Sankin").

2. Augustus Capital LLC ("Augustus") through its sole principal, Defendant Mark Abeshouse ("Abeshouse") and its attorney, Defendant Rhonda Leonard ("Leonard"), maliciously instituted a National Association of Securities Dealers ("NASD") (now the Financial Industry Regulatory Authority ("FINRA")) arbitration (the "NASD Arbitration") against Sankin, claiming that Sankin owed Augustus various fees and commissions stemming from Sankin's affiliation with Augustus as a registered representative.

3. Defendants were or should have been aware that the claims made against Sankin in the NASD Arbitration lacked probable cause. Instead, the NASD Arbitration was part of a continuing scheme by Defendants to unilaterally and retroactively impose onerous new terms on a commission-sharing agreement (the "Agreement") between Sankin and Augustus under which

Sankin shared with Augustus a certain fixed amount of the commissions he received for selling interests in the biotechnology hedge funds Perceptive Life Sciences Fund, L.P., Perceptive Life Sciences Qualified Fund, L.P., and Perceptive Life Sciences Offshore Fund LTD (collectively, "Perceptive").

4. Abeshouse and Leonard bore a grudge against Sankin because of his tremendous financial success in the hedge fund world and their ensuing unhappiness with the Agreement, which Sankin refused to renegotiate. As evidence of the spite exhibited by Abeshouse and Leonard toward Sankin were the defamatory statements made on Sankin's Form U5 falsely suggesting that Sankin was terminated from Augustus as a result of "compliance" issues.

5. The arbitration panel denied all of Augustus's claims and found that the statements made on Sankin's Form U5 were defamatory. The panel recommended expungement of the Reason for Termination section of Sankin's Form U5 filed by Augustus and the change of the Reason for Termination to "voluntary."

6. In addition to the great physical, psychological, and financial toll of defending himself in the NASD Arbitration, the NASD Arbitration adversely affected Sankin's recovery from cancer treatment that he was undergoing at the time the NASD Arbitration was instituted. The NASD Arbitration also damaged Sankin's relationship with Joseph Edelman ("Edelman"), Managing Member of Perceptive Advisors, LLC ("Perceptive Advisors") and was a contributing factor in Sankin's removal by Edelman as an officer of Perceptive Advisors in December 2006.

## JURISDICTION AND VENUE

7. The Court has venue pursuant to N.Y. CPLR § 503(a) because Defendants reside in Westchester County.

## PARTIES

8. The Plaintiff is a resident of the State of Florida and resides at 6955 Queenferry Circle, Boca Raton, FL 33496.

9. Upon information and belief, Defendant Abeshouse is a resident of the State of New York, County of Westchester, and resides at 110 Pondview Lane, New Rochelle, NY 10804. Abeshouse is the sole principle and Managing Member of Augustus.

10. Upon information and belief, Defendant Leonard is Abeshouse's wife and Augustus's General Counsel, is a resident of the State of New York, County of Westchester, and resides at 110 Pondview Lane, New Rochelle, NY 10804.

## NON-PARTY

11. Augustus is a FINRA-member broker-dealer firm with its principal place of business in Westchester County, New York State at 550 Mamaroneck Avenue, Suite 508, Harrison, NY 10528.

## FACTS

12. Sankin became a registered representative of Augustus in February 1999.

13. Sankin entered into a Selling Agreement with Perceptive on March 16, 2000 under which Sankin agreed to sell interests in Perceptive. For most of the duration of the Agreement, Sankin was compensated with a certain number of "basis points" of the funds invested in Perceptive that were attributable to his marketing efforts.

14. In exchange for allowing Sankin to "park" his broker-dealer license and for providing Sankin with a list of prospective investors, Augustus shared a certain fixed amount of the commission that Sankin received from Perceptive attributable to each specific investor that the parties agreed had a connection to Augustus. Under the Agreement, the commission shared

constituted the entirety of the compensation covered under the Agreement. Furthermore, the Agreement provided that Augustus would share in commissions paid to Sankin only for the period during which Sankin was registered with Augustus.

15. In most cases, Sankin and Abeshouse negotiated the number of "basis points" that Augustus was to receive for each investor or group of investors. As Sankin's commission was reduced by Perceptive, Sankin and Augustus in turn negotiated reduced commission rates due to Augustus for future investments.

16. Over the five and one-half years during which Sankin was a registered representative of Augustus, First New York Securities, LLC ("First New York"), which executed a substantial portion of Perceptive's securities trades, sent Abeshouse a monthly statement of commissions earned by Sankin from Perceptive along with a check for the total amount of the commissions. After Augustus deducted its share of the commissions under the Agreement, Abeshouse sent the remainder of the commissions to Sankin. Sankin also sent Abeshouse a monthly statement detailing the commissions he earned from Perceptive as well as a detailed accounting of Augustus's share of the commissions.

17. Over the course of the entire Agreement, the amount of the commissions retained by Augustus totaled approximately $336,473. During that period of time, Sankin's earnings from Perceptive dramatically increased.

18. Abeshouse did not object to the commission statements for 46 consecutive months. In a series of e-mails beginning in or around early 2004, Abeshouse began expressing his displeasure with the Agreement and indicated to Sankin that he sought to renegotiate it. In these e-mails, Abeshouse acknowledged that he and Sankin had an agreement, but said that he wanted to alter it because the amount he was receiving under the Agreement had become insulting to

4

him now that Sankin was experiencing great success in the hedge fund world. Abeshouse took this position notwithstanding his expressed view that he knew that he and Sankin "had a deal" which he was "reluctant to go back on."

19. After repeated pleas by Abeshouse to renegotiate the Agreement, Sankin agreed to pay Augustus a fixed additional amount of $1,000 per month to compensate Augustus for claimed additional overhead expenses, although Augustus never provided any documentation or specifics for such expenses. Aside from this additional amount, Sankin never agreed to pay any other additional compensation to Augustus under the Agreement.

20. Despite Sankin's goodwill gesture in offering additional compensation, Abeshouse remained unhappy with the Agreement. Abeshouse expressed this continuing resentment through e-mails in which he expressed displeasure that Sankin was making significantly more money than Abeshouse had expected.

21. In June 2004, Leonard wrote a purportedly independent opinion letter ("Opinion Letter") in which she acknowledged the existing agreement between Sankin and Abeshouse and advised Abeshouse to charge Sankin "additional fees" if Sankin did not agree to a new compensation agreement. In the letter, Leonard also advised Abeshouse that he should note on Sankin's Form U5 that he had compliance issues if Sankin did not agree to a new compensation structure.

22. On June 24, 2004, Augustus distributed a memorandum setting forth a new compensation schedule effective July 1, 2004 for registered representatives of Augustus.

23. Sankin refused to accept the new compensation schedule and resigned from Augustus on July 8, 2004.

24. Upon Sankin's resignation from Augustus, he became a member of Perceptive Advisors and ceased being paid under the Selling Agreement.

25. After Sankin resigned from Augustus, Abeshouse sent him several e-mails in which he made veiled threats with regard to Sankin's Form U5 unless Sankin reconsidered his resignation and accepted the new compensation structure.

26. When Sankin refused to reconsider his resignation, Abeshouse indicated on Sankin's Form U5 that Sankin was "permitted to resign" and wrote in the comments section that "[a] dispute arose regarding Augustus Capital LLC's compliance policies resulting in the resignation of employee Sankin."

27. The statements on Sankin's Form U5 were completely and utterly false, and were included on Sankin's Form U5 in a blatant attempt to harm Sankin's future employment opportunities.

28. Following Sankin's resignation from Augustus, Abeshouse requested that Sankin continue to remit commissions to Augustus despite the fact that the Agreement provided for commission payments only as long as Sankin was a registered representative of Augustus. Sankin refused to continue paying commissions to Augustus after his resignation.

29. In 2005, Sankin was diagnosed with renal cell carcinoma and required immediate surgery to have his cancerous kidney removed. Defendants were aware of Sankin's condition.

30. One day before Sankin checked into the hospital to have his cancerous kidney removed, Defendants served Sankin with the Statement of Claim in the NASD Arbitration. Upon information and belief, Defendants knew that Sankin was scheduled for surgery on or around the day following service of the Statement of Claim.

31. Abeshouse and Leonard were extremely reluctant to agree to extensions of due dates in the NASD Arbitration to accommodate Sankin's post-operative recovery despite Sankin remaining in the hospital for an extended period of time after he suffered a life-threatening infection.

32. The NASD Arbitration took place between April 9-11, 2007 and June 12-14, 2007.

33. During the NASD Arbitration, Abeshouse and Leonard intentionally misrepresented, among other things, the nature of the Agreement with Sankin and falsely claimed that Sankin owed various fees and commissions, including a "Placement Fee," a "Marketing Fee," and a "Broker-Dealer Fee," which Defendants knew were not part of the Agreement.

34. During the NASD Arbitration in April 2007, in an off-record comment to Adam Weiss, one of Sankin's attorneys, Abeshouse stated, "I don't care if I win or lose, I just like to fight."

## FIRST CAUSE OF ACTION
(Malicious Prosecution)

35. Sankin repeats and realleges the allegations set forth in paragraphs 1 through 34, as fully set forth herein.

36. On or about May 10, 2005, Augustus through Abeshouse and Leonard instituted the NASD Arbitration against Sankin, claiming that Sankin owed Augustus various fees and commissions, including a "Placement Fee," a "Marketing Fee," and a "Broker-Dealer Fee." Augustus also claimed that Sankin was obligated to continue paying commissions even after his resignation.

37. Defendants knew or should have known that their claims in the NASD Arbitration lacked any basis in fact. Previous to filing the action, Abeshouse, in various e-mails written to Sankin, contradicted the claims in the NASD Arbitration and acknowledged the true agreement

between himself and Sankin. In her Opinion Letter, Leonard also contradicted the claims in the NASD Arbitration and acknowledged the agreement between Abeshouse and Sankin.

38. The NASD Arbitration terminated in favor of Sankin on all counts. The arbitration panel also found that the statements made by Abeshouse on Sankin's Form U5 were defamatory. The panel recommended expungement of the Reason for Termination section of Sankin's Form U5 filed by Augustus and the change of the Reason for Termination to "voluntary."

39. Abeshouse and Leonard exhibited malice toward Sankin, as evidenced by their defamatory statements on Sankin's Form U5, their service of the Statement of Claim one day before Sankin's cancer surgery, and the correspondence between Abeshouse and Sankin in which Abeshouse expresses his displeasure with the Agreement. Abeshouse's malice toward Sankin is also demonstrated by his statement, "I don't care if I win or lose, I just like to fight."

40. As a direct, proximate result of Defendants' malicious prosecution, Sankin was forced to incur substantial costs, fees, and disbursements in defending against Defendants' vindictive pursuit of a frivolous arbitration. Also as a direct, proximate result of Defendants' malicious prosecution, Sankin's recovery from cancer was adversely affected. Furthermore, Defendants' malicious prosecution damaged Sankin's relationship with Edelman and was a contributing factor in Sankin's removal as an officer of Perceptive Advisors. As a direct and proximate result of Defendants' malicious prosecution, Sankin has suffered damages in an amount to be determined at trial but not less than $500,000.

WHEREFORE, Plaintiff respectfully demands judgment as follows:

A.  Against Defendant and in favor of Plaintiff for compensatory damages in the amount of $500,000 plus prejudgment interest pursuant to CPLR § 5001;

B. Awarding to Plaintiff punitive/exemplary damages in the amount to be determined at trial;

C. Awarding to Plaintiff the costs and disbursements of the action, including reasonable attorneys' fees; and

D. Granting such other and further relief as this Court deems just and proper.

Dated: New York, New York
October 11, 2007

Respectfully submitted,

DICKSTEIN SHAPIRO LLP

By: _____
Ira Lee Sorkin
1177 Avenue of the Americas
New York, New York 10036-2714
Telephone: (212) 277-6500
Facsimile: (212) 277-6501

DOCSNY-266812v04